UNITED STATES *v.* R. H. MACY & CO.

No. 7561.—Invoices dated Montreal, Canada, November 16, 1945, etc.
Certified November 17, 1945, etc.
Entered at New York, N. Y., November 29, 1945, etc.
Entry Nos. 724685; 726122.

(Decided March 5, 1948)

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the plaintiff.
*John R. Rafter* for the defendant.

OLIVER, Presiding Judge: The merchandise involved in these collector's appeals for reappraisement consists of round and square sterling silver compacts imported from Canada on or about November 16 and 26, 1945, respectively. They were entered and appraised at $2.25 each, plus 8 per centum sales tax, for the square compacts, and $3 each, plus 8 per centum sales tax, for the round compacts, United States currency.

The Government now contends that the compacts have higher foreign values based upon the prices at which compacts were sold by the Canadian wholesalers to retailers for home consumption. The importer, on the other hand, denies that the compacts have foreign

values and contends that the purchase prices herein are the export values and the correct values for the merchandise.

The Government introduced in evidence a report of Customs Agent E. J. Allen dated January 28, 1946, which was received as collective exhibit 1 (R. 3). The defendant introduced an affidavit of Eli Brown, President of Dorel Jewellery Co., Ltd., the manufacturer and seller of the compacts in question, dated October 17, 1946, which was received in evidence as exhibit 2. Collective exhibit 1 indicates that the manufacturer sells these compacts freely to all its customers in the United States at $2.25 for the square and $3 for the round, f. o. b. Montreal, as invoiced herein. The 8 per centum sales tax does not apply on sales for exportation. Identical compacts are sold to jobbers only in Canada at $2.25 for the square and $3 for the round, Canadian funds, not including taxes.

As these compacts were freely offered for sale and sold by the manufacturer to all its customers in the United States within the terms of section 402 (d) of the Tariff Act of 1930, an "export value" of $2.25 each for the square compacts, and $3 each for the round compacts, United States currency, packed, existed therefor. The next question for consideration is whether or not this merchandise also has a "foreign value" as defined in section 402 (c) of the tariff act, as amended by the Customs Administrative Act of 1938.

With respect to the Canadian manufacturer's transactions for home consumption, collective exhibit 1 further states that the manufacturer, Dorel Jewellery Co., Ltd., "does not freely offer the merchandise under consideration to all purchasers in the Canadian market, but will sell only to wholesalers," and that "All sales of the merchandise in question have been confined to the firm, Dorel Vanities Limited" which is a subsidiary of the manufacturer set up to wholesale the compacts. Defendant's exhibit 2 also shows that compacts like and similar to those in question are sold by the manufacturer for home consumption in Canada to wholesalers only and that the only prices at which the manufacturer made such sales at the times of exportation of the merchandise in question were Canadian $2.25 each for the square compacts and Canadian $3 each for the round compacts packed, plus taxes.

Whether, as further stated in the customs agent's report (collective exhibit 1, page 3), all sales in the Canadian market of the merchandise in question by the Dorel Jewellery Co., Ltd., "have been confined to" only one wholesaler, namely, Dorel Vanities, Ltd., a wholesaler which is admittedly a subsidiary of the manufacturer, or whether the manufacturer herein offered its compacts for sale for home consumption in Canada to "wholesalers only" (exhibit 2, par. 4), is immaterial in view of the conclusion reached herein.

As indicated in collective exhibit 1, page 4, prices in Canada for the compacts in question are dictated by the Wartime Prices and Trade Board for the Canadian Government. Quoted below is the Board's release for such or similar merchandise:

*New Revised 1944 Release*

Firm—Dorel Jewellery Co. Ltd.

\*　　　　\*　　　　\*　　　　\*　　　　\* ·

This Release is subject to the following conditions:

(A) No goods covered by this release may be shipped without a retail price tag being placed on each article.

(b) The price shown on the retail price tag shall be identical to the price shown in the right hand column of this release.

All other terms and conditions of sale, including any customary discounts in effect during the basic period, September 15th, 1941, to October 11th, 1941 must be maintained.

| Article | Description | No. | Wholesaler | Selling price to Retailer | Consumer |
|---|---|---|---|---|---|
| Compact____ | Square, sterling__ | —- | 2. 25 | 4. 15 | 7. 50 |
| Compact____ | Round, sterling__ | — | 3. 00 | 5. 50 | 9. 00 |
| | | | Tax additional | Tax included | |

The record shows that the compacts were resold by Canadian wholesalers to Canadian *retailers*, for home consumption in Canada, at the time of exportation of the instant merchandise, at $4.15 each for the square compacts and $5.50 each for the round compacts, Canadian funds, packing and tax included. The Government admits that the sales by the manufacturer to Dorel Vanities, Ltd. cannot be considered for the reason that they were restricted to one purchaser, but contends that the wholesaler could and did sell to any retailer without restriction, and, therefore, the prices at which the retailers purchased the articles were the prices at which the merchandise should be valued. The importer contends that the control by the Canadian Government in the offers for sale for home consumption in Canada applied not only to the offers by the manufacturer to the Canadian wholesaler but also to the Canadian retailer and by the latter to the consumers; in other words, that the price restriction in question was not limited to the transactions of the manufacturer but extended to the resale of the compacts by the Canadian wholesalers and retailers.

The Government directs attention to the case of *United States* v. *H. W. Robinson & Co. et al.*, 19 C. C. P. A. 274, T. D. 45436. In that case, in determining the foreign value of certain silk tie squares imported from England, it was held that the price which the manufacturer received from the wholesaler did not meet the requirements of the statute inasmuch as the goods were only offered to one class of purchasers, to wit, wholesalers, and as such were not freely offered to

*all* purchasers and such transactions were, therefore, restricted. It was further held that the resale price of the wholesalers to the retail dealers, in wholesale quantities, which wholesalers were not restricted in their sales to any particular purchasers, should be taken as the proper basis of value. The facts of the present case are clearly distinguishable from the facts of the *Robinson* case, *supra*, and the principle announced therein is not applicable here.

The Government asserts that the prices for the compacts listed by the Canadian Government for home consumption were only maximum prices, and that Dorel Vanities, Ltd. could charge less than the maximum prices. It then argues that the fixing of maximum prices by governmental authority is analogous to the fixing of minimum prices at which an article could be sold by a trade association and that such an agreement has been held not to constitute a controlled market, citing the case of *Mager & Gougelman, Inc.* v. *United States*, 13 Cust. Ct. 394, Reap. Dec. 6065. That case was concerned with a price restriction of an association of manufacturers which merely fixed the minimum prices at which the members of the association might sell certain merchandise to their various classes of purchasers. However, there was no restriction on the price at which such purchasers might resell to their customers. See *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs), 517, T. D. 47497.

In *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. 131, C. A. D. 262, the merchandise consisted of drinking glasses and appraisement was made on the basis of foreign value. The record disclosed that all of the glass manufacturers in Belgium formed a syndicate which was subsequently placed under the direct supervision of the Belgian Government by official decree and that minimum prices were fixed at which the manufacturers had to dispose of their products for home consumption as well as for exportation. Failure on the part of any manufacturer to sell his product at at least the fixed prices resulted in severe penalties. In the Belgian market no glassware could be sold for home consumption except on condition that it was not to be exported. With respect to glassware purchased for exportation, its purchase price could not be less than the minimum required by the syndicate for the country designated as being the destination of the goods, and it could not be shipped to any other country. Our appellate court held that the fixing of a minimum price is not of itself sufficient to prevent the finding of foreign value but found that there was a restriction on glassware sold for home consumption which followed the merchandise to its use. The glassware purchased for home consumption could be resold at any price but only for the home market. It was held that the merchandising practice therein did not constitute the kind of trading contemplated by the statute for the reason that it was not a price freely offered to

all purchasers since those who purchased for home consumption did not acquire free use and dominion over the merchandise.

There is no support in the present record for the contention of the Government that the controlled prices, i. e., the prices for the compacts required by the Canadian Government for home consumption in Canada to wholesalers, retailers, and consumers, respectively, were only maximum prices, and that lower prices were permissible. The record discloses the contrary. Respecting price control, collective exhibit 1 indicates that the terms and conditions of sale, including customary discounts, in effect during an earlier base period, viz, September 15 to October 11, 1941, must be maintained and that "no goods * * * may be shipped without a retail price tag being placed on each article" and also that "The price shown on the retail price tag shall be identical to the price" fixed by the Wartime Prices and Trade Board in such release.

I am of opinion that the present record supports a finding that the prices at which such or similar compacts were offered for sale and sold for home consumption in Canada to wholesalers only, or to only one wholesaler, as well as to retailers or ultimate consumers, do not represent "foreign value." The "price" at which the compacts were offered and "all other terms and conditions of sale, including any customary discounts" were dictated by the Canadian Government and, therefore, the market for home consumption was controlled. As was stated by our appellate court in *United States* v. *Graham & Zenger, Inc., supra,* page 135, "The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint."

On the basis of the record before me I hold that the proper basis of appraisement of the compacts in question is export value as that value is defined in section 402 (d) of the Tariff Act of 1930, and that such values were $2.25 each for the square compacts, and $3 each for the round compacts, United States currency, packed.

Judgment will be rendered accordingly.